Respectfully, this is not a general obligation to pay a case. The government passed a statute, the Affordable Care Act, that forced the plaintiff appellants to contribute to an involuntary reinsurance pool, a pool that they could never recover from. The statute was not indifferent, and I'll use the language from Eastern Enterprises, the statute was not indifferent as to how a regulated entity elects to comply or the property it uses to do so. It was very specific. The government made group health plans as part of the definition of contributing entity, and as a result, it targeted these trust funds to pay into this insurance pool. When you say it targeted these trust funds, how exactly did it do that? Because obviously the statute doesn't call them out by name or anything like that, so how is it that it targeted them? And how does that compare to what you think the targeting was in some of the other cases that we discussed? Sure. So, Your Honor, and the briefs make this pretty clear that we're, the parties are talking past each other in certain respects. We're in the Webbs-Phillips-Brown camp. The government is in Eastern Enterprises. Eastern Enterprises, Commonwealth Medicine Camp. I know. There's three cases on each side. It's nice and even now. Right. So the reason that, and our position is based on this, Your Honor. The statute says group health plans is, the contributing entity is defined as its commercial insurers and then third party administrators on behalf of group health plans. Group health plans are employee welfare benefit plans that pursuant to two federal statutes have 100% of their assets in trust. So, while it doesn't, if the standard, and frankly, I'm curious. Just to be clear, so the statute identifies them as group health plans, and you're saying 100% of the statutorily defined group health plans are trust funds? Let me walk that back. Yes, that's what I thought. I want to make sure I really understand this. Yes, I want to make sure that that's clear. This is in the summary judgment record. It wasn't decided below by the claims court, but it's in the record. So, under ERISA and the Taft-Hartley Act, there are, it's not 100% of all group health plans impacted by this particular provision, but it's most of them, and it's a high percentage of them. For those, under ERISA, for example, 100% of assets are held in trust. Under the Taft-Hartley Act, same thing. 100% of assets are held in trust. There are 990 IRS filings. There are 450, 500 Department of Labor filings that indicate all of this. The government knows, and the government and HHS, when they interpret these statutes, and the drafters of these provisions, knew that group health plans, for the most part, and we wouldn't proceed on behalf of anybody who did not have all of their assets in trust, but for the most part, they are trusts. So, when you say the Stonemasons or Operating Engineers group health plan, you are identifying the trust. They are synonymous. They're essentially interchangeable. But the statute says required to make payments. It doesn't say anything about a specific kind. That's true, Your Honor. So how do we get around that? Well, because, and I'll use Justice Kennedy's words from Eastern Enterprise, if the statute neither targets a specific property interest nor depends upon any particular property for the operation of its statutory mechanisms. So, you're correct, Your Honor, it doesn't say pay it out of those trusts, but there is no other money for them to pay it. But there is other ways. What about the argument that you could lend? You could go get a loan? It's an argument that I didn't see a response to, but, I mean, it doesn't say right out of the fund. Other than, I guess, other than to leverage their assets from a trust would nevertheless be implicating part of the property of that trust. If you did do a loan, it's notwithstanding that it's still part and still taking private property held in those trusts. I don't, other than to borrow the money from someone else, as Your Honor is suggesting, that nevertheless encroaches and leverages money that is in the trust and is held as private property. Does money have to be held in a single trust? Or, in theory, could it be distributed in multiple trusts so it's not a specific fund? I'm not asking you what your clients do. I'm asking, would it be possible? The way these are set up traditionally is they are set up under trust agreements, custodial agreements. They're not spread out over. So, in other words, Your Honor, I'm not sure if this is where your question is going, but they don't pay plan expenses, stock loss payments. They don't pay administrative expenses out of one trust and then claims out of another. That's exactly where my question was going. Out of another trust. They pay everything out of... I know, but they could. I got to figure out, is this a specific, like, identifiable fund? Or is this, you know, money? So let me respond to that point, Your Honor. If we're dealing in theoreticals, I don't even want to concede that they could because I'm not sure that administratively they could do that, but even if they could, they never have. And the government has always known that they never have. The tax filings alone would tell them. The 5500 alone, the filings alone from the Department of Labor would tell them that that's not how they're set up. So it's a question of, did they target a specific fund? Yes, that fund was identifiable and known to the government in advance of passing the statute. Well, it was known to the government, but there's nothing in the statute that says that the plaintiffs were required to use those assets to satisfy the contributions, though. So it sounds like you're making much about the fact that it was known when the statute was passed that this might be the result, but there still seems to me that there were other alternatives. Again, Your Honor, where I keep coming back to is that there are no other assets to use to pay. So if the standard is that the government has to specifically name a particular trust in order for there to be a taking, I don't think that's the standard, by the way. I think that is way too easy to work around. I think that is way too broad and way too, I'm sorry, way too exacting. But if that's the standard, we probably don't need it in this case. But given the way all of these things have been set up for decades and years, and the government pursuant to federal law, I don't think it's a fair outcome to say, well, they have money and I guess they could have used their money from, actually, I take that back, there is no money in any other part of these plans. All of their assets are in one place. So other than to, and that's not what Justice Kennedy says. He doesn't say name. He says targets for operation of its statutory mechanisms. So that's Eastern Enterprise. That's exactly what he says. That's exact. And then he says, and I apologize for skipping back, but he says, if the statute isn't different as to how a regulated entity elects to comply or the property it uses to do so, well, I guess your argument, Your Honor, as well, doesn't say you have to use. No, no, just a question. I apologize. Your question is, it doesn't say, so why couldn't they use money from anywhere else? And I guess my response is, if it's defined in a certain way, the government knows all of these assets are held in trust. They know that it's been that way for decades and decades. That's not indifference in our view. And I think I know what the answer to this question is, but I take it there's no cases that have facts like this case, where you're relying on one statute to say, this is the statutes that's, you know, the regulatory taking, combined with another statute that says, you know, identifies where the funds are going to come from. There's nothing like that, right? I mean, this is a pretty unique set of facts, right? Yes, we actually talked about that about 12 minutes ago. You know, I don't think there's another case that's quite on all fours in terms of that type of drawing that line between those two. I haven't found one case like that. How much money is at issue in this case? I don't know the precise amount. The sums raised by the TRP were in the billions. And I don't know exactly how much came from... But I guess what I'm wondering is, is this case simply about the particular named trusts here, such that we're talking about tens or hundreds of thousands of dollars, which I think is actually the amount we're probably talking about is hundreds of thousands of dollars. You know, or once we decide this case, is it a floodgate for the billions? It is, well, these particular plaintiffs are about $370,000. Yeah, that's what I thought, hundreds of thousands. Yeah, and so what I don't have is information from, in the below proceedings, because we didn't get to that point, but we don't have information about how many trusts on behalf of group health plans paid into the plan. So commercial issuers were part of... Is there a statute of limitations problem, though? Like for anyone, I'm wondering what the impact of what we do here is, right? And so is there a statute of limitations problem? I mean, you all brought this to, we're talking about what tax years? 2014 to 2016? Right. Right, and there's a seven-year statute of limitations, isn't there? Six or seven, six years, maybe six years? Six, I think. Six years, right? So I'm wondering what's in the pipeline, i.e., how many cases will be affected by this? Is this a small decision that affects $370,000, or is this decision swing a billion? I don't think it's a small decision in the sense that because of the way we brought the proceedings below, and we brought them on behalf of a putative class, I don't know that an individual lawsuit would be foreclosed under statute of limitations. That being said, the government did move... I'm sorry, was it certified as the class? I can't... It was denied as moved. It was not certified as a class. Okay, so this is not currently a class action.  This is a class... I'm just like, this is from Kendal Down. This is a case that we're deciding with regard to these trustees at the present time. Correct. Yes. Yes, Your Honor. And there may remain open a question as to whether the statute of limitation bars expanding this decision to cover other potential trusts in the time frame of 2014 to 2016, because it seems to me that we're beyond the six-year period for people who didn't file. That's correct. But as to, just to answer your question, Your Honor, as tolling, that can have an impact. So the way that we brought the claims below in the claims court, now if our case wasn't timely from the outset, it doesn't matter. None of these cases are timely. But if that case was timely, then it's a possibility. So I don't want to tell you that no one would have a claim for that and it's only these two, because I don't think that's correct. But that issue has also not been decided. Okay. Can I ask a hypothetical? Because this is how I hear it. Congress knows that the majority of Americans pay their taxes out of their checking accounts. So when they pay their taxes, it comes out of the checking account. Is the obligation to pay taxes a taking because the money there comes from a checking account? Because it sounds like what you're saying is, and this is how I understand the argument, is that when the statute was passed, they knew that the only funds available to the plans would come out of the assets of the plan. So it seems to me that's a similar analogy. And what do you say? So my response to that, Your Honor, is no, that's not. Well, this is not a tax. We went down the tax refund statute road in this case. But the ordinary taxpayer can pay money out of a savings account, a checkings account, bonds, cash, securities and liquidity, any of their holdings. But you still haven't said that you couldn't go get a loan. So what's the difference? Well, because the loan scenario in this case, again, no one's going to give you a loan without collateralizing it based on some amount of property. And the property that you would have to use, again, that just goes back to, that's just sort of one step beyond around directly from this private property agency. Can we stick with that for a second? Because I have a question about your plan. And I didn't see a response to it that the government raised. When you look at Article 2, Section 3 of your plan, it says that it's accepted, specifically permitted by ERISA, the Internal Revenue Code and other applicable law, the assets of the fund and the plan shall never inert to the benefit of the employer, et cetera, et cetera. The government says this means the plan assets can be used to satisfy the TRP contributions. And I didn't see a response to that. I think, you know, I think the response, Your Honor, is just this sort of general boilerplate language that's in every trust agreement of other applicable law does not permit, is not a window that the government can walk through and then compel this type of contribution, which was not small, even to these two plaintiff appellants, and say, well, you know, there is this stock language in your trust agreement. So therefore, you're not allowed to challenge this as a taker. I have another question for you. How in Eastern Enterprise or Commonwealth Edison, how in the interest cases, how was that interest obtained by the government? Was it seized directly by the government, or was it paid out of the fund that it was in to the government? I'm asking a procedural question. I don't, how did the government obtain that money? Oh, I think the government in the interest law's principal cases, I think the government seized that money as opposed to had them pay that money in here. And candidly, they had them pay. But that's what I'm trying to figure out. Because in any of the cases that you like, Commonwealth, not Commonwealth, you're the web, you're Webb Brown Phillips. In any of those cases, did the person whose money was being taken have to pay the money the way you have to pay the money? Or in each of those cases, you know, how did, you understand what I'm getting at, right? Judge Bum was asking you questions about where you could have taken a loan to pay the money. And you're like, well, we have no other assets. It's all the same thing. The trust is the trust. And so what I'm trying to figure out is, is there anything in any of these cases that you could analogize to that would help me get past the issues that she's raised by saying, well, in these other cases, it was deemed, you know, a government taking, but they had to write a check. I think I'll check for a reply. But I think the only case that comes to mind is maybe Brown where it was paid over to a third party and then paid over. You see, there's a difference between the government coming in and seizing a portion of your land, like actually physically taking it, and the government ordering you to pay something as a result of their desire to basically have a portion of your land. And I'm trying to figure out which of those actions is implicated here. So I understand your question. My response would be the only difference in a practical sense is that we didn't move for injunctive relief for it, that we paid it first instead. So if we had brought this in an injunctive capacity, we would be having a different conversation because that money wouldn't have been paid yet. We would have been trying to stop the government from actually coming in. Because even though we had the right check, the government was forcing us to write this check. And if we didn't write this check, there wouldn't have been an enforcement action followed by the government with penalties, et cetera. So only because we didn't... Well, but that kind of parallels taxes, right? If I don't pay my taxes, the government could have put a tax lien on my house. I mean, that's... Yeah, yeah. But again, if we're in the posture where we paid over, and yes, we had to pay it over, although Horn is a case, the Raisins case, where the government came in and actually tried to physically paint the actual Raisins. What are you talking about? What's Horn? Oh, I'm sorry. Gosh, I'm blanking on the last name. Hit him on rebuttal. I'll hit him on rebuttal. That's my time. Okay, great. I'll do my best. Thank you. Yep. Let's move over to Mr. Kushner, please. Thank you. Good morning, Your Honor. And may it please the Court. In Commonwealth Edison, this Court, sitting on bunk, held, and I quote, the takings clause does not apply to legislation requiring the payment of money. That holding should resolve this appeal. Just like in the statutory schemes that were applicable in Eastern Enterprises in Commonwealth Edison, the Affordable Care Act, and in particular, the TRP provision within the Affordable Care Act, required certain contributing entities to make periodic payments of a calculable sum of money into a program created by Congress. That type of scheme is nothing more than a legislation requiring the payment of money. And just like in Eastern Enterprises and just like in Commonwealth Edison, it does not implicate the kind of property interest that's protected under the Fifth Amendment. Do you see a difference between requiring periodic payments versus seizing property, like seizing interest or seizing the account, as we were just discussing? Does the government see a difference there? There may be a difference in the mechanism in which the government takes the property. Should it matter for purposes of taking? That's not something the parties briefed. I do think, Your Honor, to answer your question, I think in both Phillips and Brown, it was a direct seizure in the sense that the entities, the financial institutions, that held the AYLTA accounts were required to pay the money to the states that had those rules. I'm not sure that was the case in Webb's Fabulous Pharmacies, but I think it was a direct seizure in both Phillips and Brown. When you say direct seizure, let me just say they were required to pay those monies. I guess what I'm getting at mentally is did they write a check to pay them or did the government go in and take it? And there's a difference, right? The government infiltrates your physical property. They are present on it. That, to me, is a very manifest act of taking as opposed to, I mean, if in Phillips and in Brown, the government said, well, you've got to write me a check for the amount of the interest. So that's true. I think in all three cases someone did have to write a check because we are talking about money. It's not land where the government can send agents to take hold of a piece of property. I think in both Phillips and Brown, the entity that had to write the checks is not the holder of the AOLTA account, but it's the financial institution where the AOLTA account was. Again, I believe that's the case. But someone did have to write a check in all three of those cases. That's weird. The financial institution, so the interest didn't go into the account and the government took it. Once it was in the account, you're saying the government seized the interest before it even was placed into the account. Like you have a bank account. I have a bank account, right? The interest just goes in at the end of each month or whatever day of the month automatically into my account. I'm just trying to understand. Did the government stop the bank from providing the interest to the account so that the account didn't get the interest, or did the government demand payment of the interest once it hit the account? To be honest with you, I'm not sure what the facts of those cases were. I mean, I just, the reason I want to know.  To Judge Moore's question, wouldn't that be a distinction that matters, a material distinction? It might be in some circumstances, but I don't think it mattered for the Supreme Court in either Phillips or Brown or even Webb's fabulous pharmacies. Those three cases stand for the proposition that when a government, those cases were about states, this is about the federal government, but when a government identifies a particular category of assets and then proceeds to take that category in its entirety, that is a taking. That's what happened in those three cases, right? The government identified a category of assets, interest earned on principle. I truly don't understand the in its entirety thing. It makes no logical sense to me. If the government said, I'm going to seize half of your interest, that's not a taking. Only if I take all of your interest is it a taking? I mean, I'm going to take half your property. We all know that's a taking, right? We know from Loretto, you know, a cable box is a taking. We know it doesn't have to be all of your property in order to be a taking. Surely, if the government decided it was taking 50% of my bank account randomly for no reason, I would feel like it was taken, right? Wouldn't you? I mean, wouldn't you be like, that's a taking? I probably would feel the same way, Chief Judge Moore, but let me respond to that question. First of all, money is treated differently than other kinds of property, like personal property and land. This court said so in Loretto. So you're telling me, wait, wait, wait, I have $100,000 in the bank, and the government takes $999.99 of my money. They leave me with a penny, and that's not a taking. But if they end up taking that last penny, I now have a cause of action against the government for taking my property. Do you not see the absurdity of that position? I do see it, Your Honor, and I think— Can I just clarify, is that your position? No, no, it is not my position. When we are talking about legislation that requires the payment of a percentage of an identified category of assets, the analysis would be different. There are situations where a percentage does not implicate the fifth amendment. So let's take one of the, say, Webb, for example. Say it was, we're not going to take all the interest, we're going to take 50 percent. Explain how that would change things. Your Honor, to be honest with you, I don't know if it would. But this is your position, so you need to be able to defend it. So go ahead and explain. Our position is that this case is not like Webb's because there was no appropriation of an entire category of assets or even a percentage of a category of assets. All we have here, just like we had in Eastern Enterprises and just like we had in Commonwealth Edison, is an obligation to pay— So let's say it's 50 percent and 50 percent of the interest. Same facts as Webb except half of the interest. Because we are not just thinking about this case today. We have to think about all cases. And part of your argument in the holding below is that the entirety versus a portion makes a difference. So you need to deal with this. And I still want to know. I mean, Judge Moore has a penny left. And I don't know—you've taken all of her assets and she has a penny left. And I don't—I just—I, too, struggle with this in total argument. So, Your Honor, when it comes to this hypothetical, I think it would depend on the particular statute that we're talking about. In at least one case that I'm aware of, Sperry Corporation, the Supreme Court said that an obligation to pay a percentage of a category of assets that was identified by Congress did not implicate the Fifth Amendment. Now, it was not 99 percent. It was a low percentage. It was, I think, about 2 percent. Doesn't that—isn't that—I don't know. I guess I'm wondering—I'm thinking this is parallel regulatory takings, right? In the regulatory takings case, as opposed—physical property, regulatory, completely different universes, right? Penn Central on the one hand, you know, Loretto, Lucas on the other. And so if a physical taking—if they take even an inch of your mile, you get compensated. In the regulatory taking, it has to be substantial. It has to be a substantial taking, right? Like it isn't enough in the regulatory sense if they impose a regulation on you that diminishes a tiny bit of your otherwise right to enjoy your land, for example. So is that sort of the analogy you're trying—the in-toto thing makes no sense to me. That just—I can't even wrap my head around it. And I don't see it in any case. Right. So I'm just trying to figure out, is there some other justification for it? Like maybe this is more in line with Penn Central, and maybe it doesn't have to be in-toto, but has to be a substantial amount or something? Like the way the regulatory takings law works? Or does that even make sense here? I don't— So I think the trial court's justification for the in-toto requirements is really the fact of the three interest follows principle cases. Where in each one of those cases— Well, government got greedy and just took it all there. That doesn't mean that the government can only take it all. The government could come in and say, you know what, I'm taking half your interest. I still think that the Supreme Court would have said, that is a taking. I don't see anything in the language of the Supreme Court case that is more than just acknowledging you took all of it. I don't see anything in the case that indicates this is only a taking because you took all of it as opposed to part of it. Is that a fair—do you think that might be a fair reading of those cases? I think it's a fair reading in the sense that the Supreme Court did not say in any of those cases that it has to be a taking in-toto. I agree with that. And, again, I also would agree with you that if Congress has taken a percentage of a category of assets, let's say they identify— But you realize—I mean, you know how math works, right? Yes. You do understand that any dollar amount is a percentage of the— Well, that's always true. Correct. But that's what makes— That's how math works. Absolutely. But that's what makes money different than other types of property. That's why— But Congress can't get around a taking by saying, I'm going to—I want 50 percent of all your interest or I want $50,000. I mean, you really think that that is a distinction that legitimizes action on the one hand and makes it a taking on the other if they say, I want a percentage of everything you've got as opposed to a raw dollar amount? Probably not, Your Honor. I can't imagine this particular Supreme Court going in on that argument. But at the same time, if there is a statutory provision that requires someone to pay $50 and that someone has a single bank account with $50 in it, they cannot come in and say it's a taking just because the government happened to take 100 percent of their property. I completely agree with that. Right. And that sort of analogizes to tax law, right? Like that's—in the tax law area, the government can be taking your money and, you know, like I don't even have kids in public school, but boy, I think a lot of my tax dollars are going to the public schools, which, by the way, I'm happy to have happen. Education is important. But, you know, I don't know. I just don't know what this case is. It seems to me a bit of a hybrid. I certainly understand your arguments, but I'm just trying—I'm struggling a little bit with some of the opinion that was written below. But I certainly understand your arguments. Let me just let you keep going. And I understand that, Your Honor, what I— If the internal requirement is wrong, does the plaintiff prevail? They do not. And that's—thank you. That's where I was going. I don't think the court needs to necessarily adopt the trial court's framework in order to affirm the judgment below. All the court has to say is that this case is like Eastern Enterprises and Commonwealth Edison in the sense that Congress simply imposed an obligation to pay a calculable sum of money. And as long as that's true, just like those cases, the ACA does not implicate— Does it matter in trying to figure out whether this is a specific fund of money that this is a trust whose assets cannot be used for any— money is fungible. Like, I can use my money to pay my gas and electric bill, my heating bill, my government tax. You know what I'm saying. Yes. But with the trust, there's no other use of this money. It is only for the health care needs of the workers who are, you know, supported by that particular fund. Does that matter? So it's not just for that purpose. I think Judge Baum correctly pointed out that the trust agreements in these cases specifically say that trust assets can be used for obligations under ERISA, under the IRS, and other applicable law. And there is no argument from the other side that the Affordable Care Act is not the type of other applicable law to which trustees could legally apply trust assets. So there's no— Help me understand that. I don't have a trust, so I don't really understand the trust law part. But I would assume that if someone had a trust, that every trust would be set up to say a portion of the trust can be used to pay, for example, the administrative overhead of executing the trust. I would likewise assume that taxes, right? Any trust that exists, how could you have a trust if that trust earns interest, for example? They're going to have to file a tax return. So the ERISA or the tax piece, isn't that sort of automatic with trusts that you have to— and who else is going to pay the taxes on the trust? I mean, how—I don't know. I don't know trust law, but I'm not sure I understand. Tell me how you think those provisions of the money could also be used to pay the taxes if the trust has taxes necessarily changes the nature of the trust being a specific fund of money that is really directed to just one purpose. Well, it changes it in the sense that the trust agreements, these agreements that govern the way these Taft-Hartley plans operate, it did not forbid trustees from paying into the TRP. That is something that it provided for, this trust agreement. Okay. So it was a permissible use under the trust agreement. But how does that impact whether it's a taking or the identification—a taking because it's an identified fund versus just requesting a sum of money? Well— I'm having a hard time understanding. It's a slippery slope. It's really hard, obviously, to tell the difference between these two. But how do you think that argument that you just made helps you? So I think it undercuts the argument from the other side where they're arguing that these funds, these assets, can only be used for one purpose. And here the government comes in and requires us to use them for a different purpose. What I see them saying more is that this is an identifiable fund, and that's what, you know, distinguishes it from Commonwealth and makes it more like Webb. Except, Judge Stolz, Congress never identified any particular fund. Congress simply identified a set of contributing entities that have to contribute into the TRP. Nowhere did it say— Their argument is that Congress legislates against a background understanding of the law and that the other law requires there to be an identifiable fund. Sure. But, Your Honor, but what they're really saying is that whenever Congress imposes any sort of financial obligation on Taft-Hartley funds, it necessarily implicates the Fifth Amendment because their funds have to be in trust. It essentially precludes Congress from imposing economic legislation on Taft-Hartley funds without also incurring takings liability. And that cannot be right because Congress should be able to impose economic legislation on Taft-Hartley funds just like it can impose it on coal operators and Eastern Enterprises or on domestic utilities as in Commonwealth Edison. So if the statute had said that the payments were to be required to be paid out of their specific ERISA Taft-Hartley funds, would that be a proper answer? I think it would be a closer call in that case, but I still think you have the other part, and, you know— What's the other part? Because that's their argument. Their argument is, well, they said it, but they didn't say it, but they really said it. Because everybody knows what's coming out of their funds, and so that really is a property of interest. And so, yes, they left off the magic words out of the statute, but we all know what's going on. And so if you are going to concede that if they said what everybody knew they would want to decide, then isn't their point well taken? So the other part, Your Honor, is that it still has to be an appropriation as opposed to the imposition of a monetary assessment. And I know the Court is skeptical of the in-total requirement, but it has to be something beyond simply requiring them to pay a calculable sum. If we take, for instance, the Webb's Fabulous Pharmacist case, where there was a state that imposed an obligation to transfer the interest that was earned on interpleader funds to the clerk of the court, the Supreme Court said that was a taking of property. But in addition to that obligation, there was also an obligation to take a part of that interest and pay from that the clerk's fee, which I think was a few thousand dollars. And everyone agreed that that was not a taking, even though the State specifically identified the category of assets from which this fee would come. So it's not enough to simply identify it. The problem with that is that's a fee for services rendered. And here, I think one of the arguments the funds have made is that we can't actually apply or receive any of the benefits of this program. I don't remember what the benefits are, but you understand what I'm saying? Yes. Okay. So is that a difference, though, between in the Webb scenario, the money to pay for the clerk was actually like a fee that was owed for services rendered? We don't think that's relevant at all, Your Honor, because in Connolly, and here's why. In Connolly, the Supreme Court expressly said that by taking money from someone for the benefit of someone else, that does not turn the legislation into a taking of property. And then if you think about Eastern Enterprises. By taking money from one person for the benefit of someone else? That does not necessarily make it into a taking. There is a passage from Connolly that we cited in our brief.  And if you think about Eastern Enterprises itself, right, Eastern was a former coal operator that had to pay the health benefits of retired coal miners. Yeah, they weren't getting any benefit from them. That's right. They were retired. That's right. People who have not worked for Eastern for many, many years. It had absolutely no direct benefit from this provision of the Coal Act, and yet it still did not implicate the Fifth Amendment. What do we do with the fact that Eastern isn't a majority? It's a plurality. So that's been accepted by, I believe, every circuit in the country to mean what Justice Kennedy in the concurrence and Justice Breyer in the dissent said that it means. And then on top of that, you have this Court's precedents. You have Commonwealth Edison. You have Adams. You have cases interpreting and explaining what that majority means. So it's not a traditional majority, but there are still five justices of the Supreme Court that held it was not a taking of property because the obligation to pay in the Coal Act simply did not implicate the kind of property interest protected by the Fifth Amendment. Thank you, Counsel. Thank you. Your argument was actually very helpful. Mr. Meltzer, I'll give you your three minutes of rebuttal time, please. Thank you, Your Honor. First, in Webbs and in Brown, but I do not believe in Phillips, money was required to be paid over. In Webbs, it was from an interpreter account that I believe the receiver received not only the fees and the interest, but I believe the receiver was then required to pay over the interest pursuant to a Florida state statute. So it was, in that sense, similar, a forced exaction, I believe the Court called it. Not an exaction claim, but it was a forced exaction and is more analogous to what we have here. In Brown, in a similar way, I believe there was a directive for the financial institution to pay over the interest into a legal foundation fund. The financial institution, which was holding the IOTA account. So, not in Phillips, I believe in Phillips, it was a slightly different scenario, but I think to your question, Judge Moore, it was a pay over in Webbs and Brown, which provides more support for our arguments here. Judge Baum, the question about the, and also Judge Stoll, for your question, the question about the checking account, these are trusts. When you create a trust, you create a contract, you have a set of rules, you have to follow them, they're very specific, they can only be used for specific purposes, that's why it's a specific fund, that's what this Court has said over and over again, it's said it in Adams, it's said it many, many times. But trusts are specific funds. They are, and does the other applicable law language in the trust document change, whether it's a taking? No, of course not. It means that the trust is permitted to make that payment, it doesn't foreclose them or stop them from them challenging the constitutionality of being required to make those payments. And as to one of the last points you made with my colleague, there was no benefit here. And as to one of the earlier points, Judge Moore, and we talk about the floodgates, and I understand a little bit of the hesitation in wanting to have a bigger picture sense of it, but this were, these sums were paid by group's health plans for market stabilization for a market that they don't participate in. So while the government says... I pay taxes, and I don't feel like I'm getting my benefit value out of all of that money. I understand, but the government says that's irrelevant to the inquiry here, and I guess in one sense, because we're only dealing with the property right question, it is, but it's not relevant in the bigger picture of this case where the government... What is your best argument for how you distinguish your case from Commonwealth Edison? Because that is, to me, your hardest obstacle. So tell me the best way in which you can distinguish your case. Well, there's two distinctions, I would say. Number one, again, Commonwealth Edison did not include... It was payments required to be made by utilities for uranium processing. Number one, the uranium processing issues were created in part by those utilities, and number two, that was more of a general obligation to pay case. It was not directed out of any particular account for trust, and I think that's what this court, and I believe Judge Dyke was saying in that en banc decision, that this is more akin to Eastern Enterprises where you can't point to where the statute was indifferent, where you can't point to any in particular fund that has to be used to pay this money. And I think those are the two biggest distinguishing facts between this case and Commonwealth Edison. My last point, and I know I'm out of time, but I don't think you can just overlook the fact that these are by necessity being paid out of trust and then take us out of all the case law that for decades has talked about what the government is allowed to and not allowed to do when it comes to the private property that's held in trust. Okay, I want to thank both counsels' cases for taking their submission. I think you both did a really excellent job with your arguments, so thank you. Thank you very much.